**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____  :
                                :
THE BANK, d/b/a TEXAS BANC      :
MORTGAGE COMPANY,               :
                                :
        Plaintiff,              :
                                :         Civil Action No. 11-5338
        v.                      :
                                :             **OPINION**
LAKE ESTATES CONDOMINIUM        :
ASSOC., INC., BRUNSWICK         :
TENANTS CORPORATION and         :
THE BOARD OF DIRECTORS OF       :
BRUNSWICK TENANTS               :
CORPORATION,                    :
                                :
        Defendants.             :
                                :
_____  :

**WOLFSON, United States District Judge**:

Presently before the Court is a motion for default judgment by Plaintiff The Bank d/b/a Texas Bank Mortgage Company ("Plaintiff"), seeking default judgment against Defendants Lake Estates Condominium Assoc., Inc. ("the Association"), Brunswick Tenants Corporation ("BTC") and The Board of Directors of Brunswick Tenants Corporation ("BTC Board") (collectively, "Defendants"). Defendants cross-move to vacate the entry of default against the Defendant and seek leave to answer Plaintiff's Complaint. For the reasons set forth below, Defendant's motion to

vacate the entry of default and for leave to answer is granted.  Plaintiff's motion to enter default judgment is denied.

## I.    BACKGROUND

The facts pled in the complaint, and the procedural history of this suit, are complex.  However, since none of the instant motions reach the merits, the Court provides an abbreviated overview sufficient to dispose of these motions.  In setting forth the relevant background, the Court relies on the allegations in the complaint, albeit in no way ruling on the legal sufficiency or truth of Plaintiff's allegations, and the several certifications and declarations provided by the parties along with exhibits attached thereto.

### A.    Facts

Plaintiff The Bank d/b/a Texas Bank Mortgage Company is successor-in-interest to GreenPoint Mortgage Funding, Inc. ("GreenPoint"), the former owner of non-party Dragan Iliev's loan.  Compl., ¶ 3.  Mr. Iliev borrowed $80,100 from GreenPoint on August 24, 2006, in order to purchase shares in a cooperative, Defendant Brunswick Tenants Corporation.  Id. at ¶ 9.  In purchasing his cooperative shares, Iliev executed a Loan Security Agreement and a Note payable to GreenPoint.  Id. at ¶ 12.  He also executed a Proprietary Lease ("the Lease") that listed BTC as the lessee.  Id. at ¶ 10. He, along with BTC, further executed a Co-op Proprietary Lease Financing Provision Agreement ("the Recognition Agreement") that addressed the relationship between BTC and GreenPoint.  Id. at ¶ 14.

A few years after Mr. Iliev purchased his shares, BTC elected to convert the cooperative units into condominium units. This required BTC to retain counsel for the conversion process and BTC hired Eagan & Associates, LLC ("Eagan") to perform that role. McNulty Supp. Cert. dated November 7, 2011 at ¶ 11. In hiring Eagan, BTC executed a Cooperative Conversion Agreement that governed Eagan's legal representation of BTC in the conversion process. Id., McNulty Supp. Cert. dated November 7, 2011, Exh. A.

Eagan advised BTC that the proprietary shareholder leases dictated that only 80% of the shareholders needed to approve the conversion. McNulty Supp. Cert. dated November 7, 2011, Exh. A; id. at ¶ 36. Based on this advice, BTC held a shareholders' meeting on April 29, 2008 to vote on the conversion and the final tally was 81.84% in favor of converting the cooperative into condominiums. Compl., ¶ 20. Several months following the shareholder vote, and having found that over 80% of the shareholders voted in favor of conversion, the BTC Board approved the conversion. Id. The complaint asserts that the actual date of conversion was July 31, 2009. Id. at ¶ 23.

Once the conversion was approved by the shareholders, those shareholders who wished to retain ownership under the new condominium regime were obligated to obtain additional financing to purchase their unit. Iliev, apparently, was unable to obtain financing. Under the applicable BTC agreements, Iliev's shares were revoked and defaulted back to BTC, and Iliev subsequently filed for bankruptcy. McNulty

Supp. Cert. dated November 7, 2011 at ¶ 17; id., Exh. E.  Ultimately, BTC threatened to sell the unit to cover the cost of converting same.[1]  Compl., ¶ 31.

Plaintiff, as holder of the Loan Security Agreement and a Note payable to GreenPoint, filed the instant complaint seeking to recover its losses occasioned by BTC's conversion and the revoking of Iliev's shares.  Plaintiff seeks to recover those funds from BTC, the BTC Board, and Lake Estates Condominium Assoc., Inc., the governing association over the now-created condominium units, as successor-in-interest to BTC.  Id. at ¶ 1.

Plaintiff's first claim is a breach of contract claim based on BTC's and the Association's alleged breach of the Recognition Agreement (Count One).  Id. at ¶¶ 36-43.  According to Plaintiff, the Recognition Agreement between GreenPoint, Iliev, and BTC directed BTC to notify GreenPoint of any intention to terminate Iliev's lease or cancel Iliev's shares and, further, to recognize GreenPoint's right as lienor to payment of any sums still due under the Loan Security Agreement.  Plaintiff further asserts that the Recognition Agreement prohibited BTC from terminating or cancelling Iliev's shares without first obtaining Plaintiff's consent.  In short, Plaintiff claims that BTC failed to notify and obtain Plaintiff's consent before converting Iliev's unit and revoking his shares, in violation of the Recognition Agreement.

Second, Plaintiff asserts a breach of contract claim against BTC and the Association for BTC's alleged failure to abide by Iliev's Lease (Count Two).  Id. at ¶¶

---

[1]      It is not clear from the complaint or parties' submissions whether the unit was ever sold.

4

44-49.   Plaintiff asserts that Iliev's proprietary lease states that unanimous shareholder approval was required to authorize the conversion—not just 80%—as well as a two-third vote of the Board in favor of conversion.   By BTC obtaining only about 81%of the shareholder vote, Plaintiff claims that BTC violated the lease terms.

The remaining counts include a conversion claim against BTC and the Association for revoking Iliev's shares (Count Three), an equitable mortgage count against those same entities for the monies owed GreenPoint under the Loan Security Agreement (Count Four), and an equitable lien count against those entities seeking to recover same (Count Five).  See id. at ¶¶ 50-69.  In addition, Plaintiff brings an unjust enrichment claim (Count Five), breach of the covenant of good faith and fair dealing claim (Count Six), and a New Jersey Cooperative Recording Act, N.J.S.A. 46:8D-16 claim (Count Seven) against BTC and the Association.  See id. at ¶¶ 70-94.  Lastly, Plaintiff brings a negligence claim against the BTC Board for failing to exercise due care in supervising the conversion process (Count Eight). Id. at ¶¶ 95-101.

## B.   Procedural History

Plaintiff filed its complaint on September 15, 2011.  During the several months prior to that date, Plaintiff's counsel had engaged in settlement negotiations with Defendants' then-counsel Mr. Marra, Esq., who was assigned to Defendants via their insurance carrier.  See Daniels Cert., ¶ 4; McNulty Supp. Cert. dated November 7, 2011 at ¶¶ 1-3.  Plaintiff's counsel mailed a courtesy copy of the complaint to Marra, however, Marra indicated that he would not accept service on behalf of the Defendants. Daniels Cert., ¶¶ 6-7.  Thereafter, on September 20, 2011, Plaintiff served Defendants

directly.  Defendants, through Marra or otherwise, failed to timely answer the complaint by October 11, 2011.  One week following the answer due date, on October 18, 2011, Plaintiff sought an entry of default against Defendants and default was entered on October 19, 2011.

Meanwhile, Marra was directed to transfer the file from his office to Mr. McNulty, Esq., who is employed at another law firm and now serves as Defendants' counsel.  McNulty was formally retained on October 20, 2011—the day after default was entered—and began receiving portions of the file the following day.  McNulty Supp. Decl. dated November 7, 2011 at ¶ 3.  However, McNulty was not made aware that default had been entered or that an answer had not been filed.  Id. at ¶ 4.  Around two weeks later, on November 4, 2011, Plaintiff moved for default judgment.  Three days following the filing of Plaintiff's motion, Defendants cross-moved to vacate the entry of default and sought leave to file an answer out of time.  It is these motions that are now pending before the Court.

## II.  DISCUSSION

Because the default judgment motion and the co-pending cross-motion to vacate entry of default involve the same inquiries, I jointly consider the parties' motions.  See National Specialty, 2012 WL 868944 at *2 ("[M]otions to vacate entry of default and motions to vacate entry of default judgment consider the same factors . . . ").

### A.    Default Judgment and Cross-Motion to Vacate

A district court may enter default judgment pursuant to Fed.R.Civ.P. 55(b)(2), once an entry of default has been entered by the Clerk of the Court.  "Ultimately, the

6

decision whether to enter default judgment in any given case is left primarily to the discretion of the district court." Century 21 Real Estate LLC v. Kenneth M. Yanni, Inc., Civil Action No. 07-6078, 2009 WL 904122, at * 1 (D.N.J. Mar. 31, 2009) (quoting Hritz v. Woma Corp., 732 F.2d 1178, 1180 (3d Cir.1984)) (internal quotation marks omitted).

However, "that discretion is not unfettered, and in considering whether to enter default judgment, the Court should consider: (1) whether the defendant has a litigable defense; (2) whether the defendant's delay is a result of his misconduct; and (3) if plaintiff would be prejudiced by the denial of default judgment." Piquante Brands Intern., Ltd. v. Chloe Foods Corp., Civil Action No. 3:08-cv-4248, 2009 WL 1687484, at *2 (D.N.J. Jun. 16, 2009) (internal quotation marks omitted) (citing Chamberlain v. Giampapa, 210 F.3d 154, 164 (3d Cir. 2000)).  Some courts further consider the effectiveness of alternative sanctions. See, e.g., National Specialty Ins. Co. v. Papa, No. 11–2798, 2012 WL 868944, *2 (D.N.J. Mar. 14, 2012) (citing Emcasco Ins. Co. v. Sambrick, 834 F.2d 71, 73 (3d Cir. 1987)).

In weighing these factors, district courts must remain mindful that, like dismissal with prejudice, default is a sanction of last resort. See Poulis v. State Farm Fire & Cas. Co., 747 F.2d 863, 867 (3d Cir. 1984) ("We reiterate what we have said on numerous occasions: that dismissals with prejudice or defaults are drastic sanctions").[2]

---

[2]     Poulis describes the factors that courts should consider prior to granting a default judgment as: (1) whether there are material issues of fact or substantial public issues; (2) whether the default is largely technical; (3) whether the plaintiff has been prejudiced by the delay; (4) whether the defendants know or should know that

While courts should consider each of the pertinent factors, the meritorious defense factor is a "threshold" inquiry; the absence of a meritorious defense is dispositive.  U.S. v. $55,518.05 in U.S. Currency, 728 F.2d 192, 195 (3d Cir.1984). Overall, in considering all the factors, district courts are directed to resolve all doubt in favor of proceeding on the merits. Zawadski de Bueno v. Bueno Castro, 822 F.2d 416, 420 (3d Cir. 1987); $55,518.05 in U.S. Currency, 728 F.2d at 194 ("We require doubtful cases to be resolved in favor of the party moving to set aside the default judgment so that cases may be decided on their merits.") (internal quotation marks omitted).

### 1.   Meritorious Defense

"The showing of a meritorious defense is accomplished when allegations of defendant's answer, if established on trial, would constitute a complete defense to the action." $55,518.05 in U.S. Currency, 728 F.2d at 195 (internal quotations omitted). It is not enough for a defendant to simply allege a defense.  Rather, a defendant seeking to set aside a default must "set forth with some specificity the grounds for his defense." Harad v. Aetna Cas. and Sur. Co., 839 F.2d 979, 982 (3d Cir. 1988).  In short, "[a] defendant may not establish a meritorious defense with "simple denials or conclusory statements," but instead must provide "specific facts" supporting its defense. Borges v. Santos, No. 10–03450, 2011 WL 3515996, *3 (D.N.J. Aug. 11, 2011) (citing $55,518.05 in U.S. Currency, 728 F.2d at 195 (citations omitted)).  Where "at

---

they are subject to a default; (5) whether the default was caused by a good faith mistake or excusable neglect; (6) whether the default might later be set aside; and (7) whether a large amount of money is involved. Id. at 868-70.

least one meritorious defense" has been specifically alleged, default judgment may be inappropriate.  Feliciano v. Reliant Tooling Co., Ltd., 691 F.2d 653, 657 (3d Cir. 1982).  See Miles v. Aramark Correctional Service, Inc., 321 Fed.Appx. 188, 191 (3d Cir. 2009) (citing one meritorious defense in support of conclusion that default judgment was not warranted).

Here, Defendants have put forth two defenses, both of which I find facially meritorious.  First, Defendants have alleged specific facts contesting the authenticity of the Iliev Lease.  According to Defendants, the bulk of the proprietary lease agreements held by various lessees in the cooperative required only 80% shareholder consent to terminate all the proprietary leases.  Conversely, the Iliev Lease attached by Plaintiff to its default judgment papers states that unanimous shareholder consent is required.  This distinction is critical because, in the conversion process, BTC obtained only 81.84% of the shareholder votes.  Hence, if the Iliev Lease relied upon by Plaintiff is not authentic, the premise of Plaintiff's breach of contract action based on BTC's alleged failure to abide by Iliev's Lease (Count Two)—that the conversion was ultra vires—would unravel.

In this connection, Defendants have further alleged that they should be entitled to file a third party complaint against their former counsel, Eagan & Associates, LLC, who represented BTC in the condominium conversion.  Defendants' rationale is that Eagan advised BTC that only an 80% vote was necessary.  Thus, they argue that if the unanimous consent provision should have applied instead, they should be able to be to hold Eagan accountable on a legal malpractice theory.  In support of their malpractice

9

theory, Defendants attach a copy of their Cooperative Conversion Agreement with Eagan which expresses that Eagan is responsible for any legal errors in the conversion process.   See McNulty Supp. Cert. dated Nov. 23, 2011, Exh. A ("Cooperative Conversion Agreement") at ¶ 7 ("[E]ach party shall be liable for its negligent acts."). Defendants further reveal that they are currently in a dispute with Eagan and that have not been able to obtain certain discovery from Eagan that would shed light on the authenticity of the Lease relied upon by Plaintiff in this action.

On this limited record, Defendants authenticity argument presents a meritorious defense.  Plaintiff's breach of contract count alleges that BTC violated the Proprietary Lease by not obtaining a unanimous vote.  If, indeed, the Iliev Lease relied upon by Plaintiff is not authentic, Count Two of Plaintiff's Complaint would fail.[3] Moreover, in the event the lease is authentic, Defendants appear to assert a colorable basis for pursuing a malpractice claim against Eagan.  In the interests of judicial economy, it makes sense that such a claim, if brought, should be addressed in this suit.

Defendants' second defense is that, contrary to Plaintiff's argument, BTC did in fact provide some notice to GreenPoint prior to the conversion.  In support of this argument, Defendants attach a copy of a "SECOND NOTICE" letter dated May 28, 2010 sent from Eagan to GreenPoint, which is also referenced in paragraph 31 of

---

[3]      While the Defendants couch their argument as an authenticity defense, the Court notes that both parties have produced sample leases some of which contain the 80% language while at least one reflects the unanimous vote language. The Court is not ruling, in the context of this motion, on which lease language controlled the conversion transaction.

Plaintiff's Complaint.  McNulty Supp. Cert. dated Nov. 23, 2011, Exh. E.  The letter states: "pursuant to our letter dated July 28, 2009 (see attached), all shares in the Brunswick Tenants Corp. have been revoked ...."  <u>Id.</u> at 1.  July 28, 2009 was a few days before the alleged actual date of conversion, which was July 31, 2009.  Compl., ¶ 23.  Thus, the May 28, 2010 letter raises the specter that notice may have been given before the conversion date.  Of course, this Court is not ruling on the merits of whether notice had actually been given[4] but concludes that Defendants' argument raises a second meritorious defense by asserting non-conclusory, specific facts in support of their proposed defense.

Lastly, Defendants argue that they should be able to bring a third party complaint against Eagan for any errors in the conversion process.  While not a defense, this proposed complaint is certainly related to the negligence claim (Count Eight) against the Association for failure to properly oversee the conversion process and the inclusion of such a complaint could at least affect the Association's liability.  Therefore, based on the foregoing, I conclude that Defendants have alleged sufficient facts supporting at least one meritorious defense.[5]

---

[4]      Nor does the Court opine on whether such notice would have been sufficient under the Recognition Agreement, which Plaintiff argues also requires that consent first be obtained.

[5]      In addition, Defendants argue that the Lease relied upon by Plaintiff was not in the name of BTC, but rather a different entity called "The Courts."  As Plaintiff correctly argues, however, BTC is also referred to in legal agreements as "The Courts at East Brunswick,"and this is likely the reason a different name appears on the Lease.  <u>See</u> McNulty Supp. Cert. dated Nov. 23, 2011, Exh. A at Preamble (referring to "BTC" also as "The Courts at East Brunswick" in the Cooperative Conversion Agreement).

### 2.    Culpable Conduct

To be "culpable," the conduct leading to the entry of default must have been willful, intentional, reckless or in bad faith.  More than mere negligence is required.  See Gross v. Stereo Component Systems, Inc., 700 F.2d 120, 124 (3d Cir. 1983); Sourcecorp Inc. v. Croney, 412 Fed.Appx. 455, 460 (3d Cir. 2011).

Here, Defendants argue that their failure to timely answer was not the result of culpable conduct but was inadvertent.  According to defense counsel, Defendants chose to tender their claim to the insurer.  See McNulty Supp. Cert., ¶ 19-20.  In tendering the claim, Defendants were assigned counsel, Mr. Marra, Esq.  Plaintiff agrees that Marra entered into settlement negotiations with Plaintiff, but refused to accept service for Defendants.  See Daniels Cert., ¶¶ 6-7.  Thereafter, on September 20, 2011, Plaintiff served Defendants directly, and after Defendants did not timely answer the complaint, Plaintiff obtained an entry of default and filed the instant motion for default judgment.  Id. at ¶¶ 8-12.  Meanwhile, Defendants' carrier referred the file to McNulty, Defendants' current counsel, who was formally retained the day after default was entered.

Defendants do not dispute that it was error for Marra not to timely answer the complaint; instead, they argue that they should not be held responsible for their prior counsel's error.  Indeed, the Third Circuit has held that is an abuse of discretion for a district court to conclude that a "prior attorney's failure to file an answer on time [i]s

Accordingly, the Court rejects Defendants' "The Courts" argument as a meritorious defense.

12

culpable conduct sufficient to support the imposition of a default judgment." Sourcecorp, 412 Fed.Appx. at 460.  Moreover, the Third Circuit has held that even a six-week delay in answering does not constitute bad faith or a callous disregard for a counsel's responsibilities.  See Emcasco, 834 F.2d at 75 (collecting cases).

To the extent that current counsel can be faulted for not better communicating with Marra about the status of the case at or around transfer, that too amounts to nothing more than mere negligence.  See Zawadski, 822 F.2d at 421 (finding that a "breakdown in communication" between counsel was not culpable conduct); Gross, 700 F.2d at 124  (finding no culpability where lawyers in two different firms failed to communicate, partly due to one lawyer's vacation).  Accordingly, I conclude that Defendants' failure to timely answer in this case was not done in bad faith and does not constitute culpable conduct.

### 3.    Prejudice

Prejudice arises where the setting aside of the entry of default results in the loss of relevant evidence or some other occurrence that tends to impair the plaintiff's ability to pursue its claims.  Emcasco, 834 F.2d at 74.  See also Feliciano v. Reliant Tooling Co., 691 F.2d 653, 657 (3d Cir.1982) (holding that the "loss of available evidence, increased potential for fraud or collusion, or substantial reliance upon the [default] judgment" support a showing of prejudice). "Delay in realizing satisfaction on a claim rarely serves to establish [a sufficient] degree of prejudice." Id. at 656-57; Nationwide Mut. Ins. Co. v. Starlight Ballroom, 175 Fed.Appx. 519, 523 (3d Cir. 2006) (quoting same).

Plaintiff makes no specific prejudice argument.  Plaintiff notes that Marra, Defendant BTC's prior counsel, was not only aware of Plaintiff's claims, but also of the pleadings filed against Defendants.  However, Marra's knowledge is irrelevant to the prejudice inquiry, and Plaintiff has not pointed to any facts suggesting that granting the motion to vacate will result in loss of evidence or impair Plaintiff's ability to pursue its claim against Defendants.  Accordingly, the Court concludes that setting aside the entry of default will not prejudice Plaintiff.

### 4.    Alternative Sanctions

Lastly, Plaintiff requests attorneys fees for the instant motion, citing <u>Davis v. DND/Fidoreo, Inc.</u>, 317 N.J.Super. 92 (App. Div. 1998).  It is true that some courts consider alternative sanctions to granting default judgment, such as granting attorneys fees to the non-defaulting party.  <u>See</u>, <u>e.g.</u>, <u>Ghana v. New Jersey State Parole Bd.</u>, No. 01-1620 (JBS), 2011 WL 3608633, *10 (D.N.J., Aug. 15, 2011); <u>Chanel, Inc. v. Craddock</u>, No. 05-1593 (HAA), 2006 WL 469952, *4 (D.N.J. Feb. 27, 2006).  Other potential, non-monetary, sanctions include "a warning, a formal reprimand, placing the case at the bottom of the calendar ... [and] the preclusion of claims or defenses." <u>Titus v. Meredes Benz of North America</u>, 695 F.2d 746, 750 n.6 (3d Cir. 1982).

As an initial matter, I am not bound by the <u>Davis</u> decision which rests on a state court rule that provides for attorney fees, R. 4:42-9, rather than a federal rule or case law.  Further, in light of my conclusion that counsel's failure to timely answer was inadvertent and not in bad faith, I do not otherwise conclude that granting fees is

appropriate in this case.  Since Plaintiff has not requested any other type of non-monetary sanction, I decline to impose a lesser sanction in this case.[6]

In sum, the Court declines to grant default judgment to Plaintiffs and, consequently, grants Defendants' cross-motion to vacate.[7]

## B.    Leave to File Answer

As for Defendant's request for leave to file an Answer, courts may grant such leave "on motion made after the time has expired if the party failed to act because of excusable neglect."  Fed.R.Civ.P. 6(b).[8]  Excusable neglect is defined as "requiring a

---

[6]    The Court is compelled to note that, in light of Defendants' short delay in seeking to answer the complaint, it is unfortunate that counsel were not able to resolve their dispute without invoking this Court's participation and the parties' added expenditure of resources.  Bringing these motions has, further, delayed the Court's attention to the merits of this case.

[7]    As noted, Poulis lists the factors that district courts should considered as: (1) whether there are material issues of fact or substantial public issues; (2) whether the default is largely technical; (3) whether the plaintiff has been prejudiced by the delay; (4) whether the defendants know or should know that they are subject to a default; (5) whether the default was caused by a good faith mistake or excusable neglect; (6) whether the default might later be set aside; and (7) whether a large amount of money is involved. Id. at 868-70.  I note that consideration of these factors would further buttress my holding.  There are material issues of fact relating to the authenticity of Iliev's lease, the delay in answering was short-lived and was due to excusable neglect, and Plaintiff has not made a showing of prejudice.

[8]    Federal Rule of Civil Procedure 6(b)(1) provides:

(1) In General. When an act may or must be done within a specified time, the court may, for good cause, extend the time:

(A) with or without motion or notice if the court acts, or if a request is made, before the original time or its extension expires; or

15

demonstration of good faith on the part of the party seeking an enlargement and some reasonable basis for noncompliance within the time specified in the rules.... '[H]alf hearted efforts at service' and 'inadvertence of counsel' do 'not amount to good cause.' U.S. Small Business Admin. as Receiver for Penny Lane Partners, L.P. v. Berger, Civ. Act. No. 08-2245, 2010 WL 1133433,  at *2 (D.N.J. Mar. 22, 2010) (citation omitted). See also McCrae v. KLLM Inc., 89 Fed.Appx. 361, 364 (3d Cir. 2004) (same).  Whether good cause has been shown to extend a deadline is left to the district court's discretion. Drippe v. Tobelinski, 604 F.3d 778, 782 (3d Cir. 2010).

In exercising that discretion, district courts must consider the Pioneer factors. Id. at 784-85 (discussing Pioneer Inv. Servs. Co. v. Brunswick Assocs, 507 U.S. 380, 395, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993)).  Specifically, courts must consider: "all relevant circumstances surrounding the party's omission. These [include] . . . the danger of prejudice . . ., the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith." Id. at 785 (quoting Pioneer, 507 U.S. at 395).  Ultimately, "[t]he determination of whether neglect is excusable 'is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." Ragguette v. Premier Wines and Spirits, Ltd., 424 Fed.Appx. 155, 156 (3d Cir. 2011) (quoting Pioneer, 507 U.S. at 395).

---

(B) on motion made after the time has expired if the party failed to act because of excusable neglect.

In this case, I conclude that Defendants' delay was due to excusable neglect. As explained above, Defendants chose to first tender the complaint to their insurance carrier and it was the carrier (or carrier's counsel, Marra) that failed to answer before transferring the case to the current defense counsel. Moreover, in transferring the file, Marra did not inform McNulty that an answer was due or that default had been entered. Moreover, the default was entered only one day before McNulty was retained. Plaintiff sought default judgment two weeks and two days after default was entered, and McNulty cross-moved to vacate in connection with Plaintiff's motion.

In my view, Defendants' counsels' actions amount, at worst, to excusable neglect. For one, as I concluded in connection with my default judgment analysis, there is no prejudice to Plaintiff here. Nor is the delay here significant in length. Defendants cross-moved to vacate default promptly and, in conjunction with the motion, sought leave to answer. While one could argue that it was in the reasonable control of the Defendants to answer in a timely fashion, I see no reasons to conclude that Defendants' failure to answer was the product of bad faith. For these reasons, I conclude Defendants have demonstrated good cause for their failure to timely answer. Accordingly, Defendant is granted leave to file its answer out of time.

## III.   CONCLUSION

For the foregoing reasons, the Court denies Plaintiff's motion for default judgment and grants Defendants' cross-motion to vacate the entry of default. Defendants' motion for leave to file an answer is granted and Defendants shall file their answer within ten (10) days of the date of the Order accompanying this Opinion.

Dated: April 25, 2012                    /s/ Freda Wolfson
                                         Honorable Freda L. Wolfson
                                         United States District Judge